**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Linda Cross

    v.                                Case No. 15-cv-331-PB

Carolyn W. Colvin, Acting
Commissioner, Social
Security Administration

**REPORT AND RECOMMENDATION**

Pursuant to 42 U.S.C. § 405(g), Linda Cross moves to reverse the Acting Commissioner's decision to deny her application for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423. The Acting Commissioner, in turn, moves for an order affirming her decision. For the reasons that follow, this matter should be remanded to the Acting Commissioner for further proceedings consistent with this Report and Recommendation.

**Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without

> remanding the cause for a rehearing.  The findings of
> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g).  However, the court "must uphold a denial of

social security disability benefits unless 'the [Acting

Commissioner] has committed a legal or factual error in

evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS,

76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v.

Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Acting

Commissioner's findings of fact be supported by substantial

evidence, "[t]he substantial evidence test applies not only to

findings of basic evidentiary facts, but also to inferences and

conclusions drawn from such facts."  Alexandrou v. Sullivan, 764

F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner,

360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial

evidence is 'more than [a] mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d

594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402

U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the

[Acting Commissioner] to determine issues of credibility and to

draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Acting Commissioner], not the courts." <u>Irlanda Ortiz v. Sec'y of HHS</u>, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations omitted).  Moreover, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." <u>Tsarelka v. Sec'y of HHS</u>, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).  Finally, when determining whether a decision of the Acting Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole." <u>Irlanda Ortiz</u>, 955 F.2d at 769 (quoting <u>Rodriguez v. Sec'y of HHS</u>, 647 F.2d 218, 222 (1st Cir. 1981)).

## Background

The parties have submitted a Joint Statement of Material Facts (doc. no. 13), which is part of the court's record and will be summarized here rather than repeated in full.

Cross has been diagnosed with a variety of mental and physical conditions including fibromyalgia, degenerative disc disease, and degenerative joint disease of the knees.  She has received various forms of treatment for those conditions,

3

including medication, injections, physical therapy, and surgery.

In October of 2010, Cross began seeing a rheumatologist, Dr. John Gorman, for treatment of fibromyalgia.  The record includes 13 office notes authored by Dr. Gorman,[1] plus several reports on laboratory tests that he had ordered.  When Cross began treating with Dr. Gorman, she was working.  She continued to work until April 2011.

In a March 2012 office note, resulting from a follow-up visit for treatment of Cross's fibromyalgia, Dr. Gorman wrote:

> She tried Cymbalta at 30 mg daily, pain increased.
> She went back to 60 mg daily and feels better.
> Fibromyalgia is well controlled except for daytime
> fatigue.  Also hands are still achy and stiff.
>
> Minimal exercise lately.  Still can't work – feet sore
> if she stands long, unacceptable stiffness in legs if
> she sits long.

Administrative Transcript (hereinafter "Tr.") 332.  In that same note, under the heading "Impression & Recommendations," Dr. Gorman wrote, with respect to Cross's fibromyalgia: "Doing fairly well on Cymbalta, probably would worsen if she went back to work."  Tr. 333.  A week or so after Dr. Gorman wrote that note, Cross filed her application for DIB.  In what appears to

---

[1] Specifically, Cross saw Dr. Gorman twice in 2010, four times in 2011, four times in 2012, and three times in 2013.

be the most recent office note by Dr. Gorman, which documents a visit on July 29, 2013, Dr. Gorman wrote: "Fibromyalgia is doing well, except that her energy is still low.  Was able to get off Avinza about 2 months ago.  Myalgias well controlled on Cymbalta 30 mg daily – decreased from 60."  Tr. 557.  Under the heading "Impression & Recommendations" he wrote: "Overall doing well. Low back pain and Achilles tendinitis resolved."  Tr. 558.

In October 2012, Dr. Hugh Fairley, a state agency consultant who did not examine Cross, performed an assessment of her residual functional capacity ("RFC"),[2] based upon a review of her medical records.  The Disability Determination Explanation form that reports Dr. Fairley's RFC assessment lists diagnoses of fibromyalgia, osteoarthrosis and allied disorders, and degenerative disc disease.  In his assessment, Dr. Fairley opined that Cross could lift and/or carry 10 pounds both occasionally and frequently, could stand and/or walk, with normal breaks, for two hours in an eight-hour workday, and could sit, with normal breaks, for about six hours in an eight-hour workday.  Dr. Fairley also opined that Cross could occasionally

---

[2] "Residual functional capacity" is a term of art that means "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1).

climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders/ropes/scaffolds.

In February 2013, another non-examining consultant, Dr. Harold Ramsey, completed a Physical RFC Assessment on Cross.  He began by noting primary diagnoses of degenerative disc disease of the lumbar spine and knees, and fibromyalgia.  He opined that Cross could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk, with normal breaks, for four hours in an eight-hour workday; and sit, with normal breaks, for about six hours in an eight-hour workday.  Dr. Ramsey identified the same postural limitations that Dr. Fairley identified.

Also in February 2013, Dr. Gorman filled out an Arthritis Impairment Questionnaire on Cross.  After identifying relevant diagnoses of fibromyalgia and chronic low back pain, Dr. Gorman opined that Cross could: (1) lift up to five pounds frequently and up to 10 pounds occasionally, but could never lift more than ten pounds; and (2) carry up to five pounds occasionally but never carry more than that.  He further opined that during an eight-hour workday, Cross could sit for less than one hour, and could stand/walk for about an hour.  He also opined that it was necessary or medically recommended that Cross neither sit

continuously nor stand/walk continuously in a work setting. Finally, Dr. Gorman opined that Cross: (1) needed to get up and move around every hour or so; (2) could return to a seated position in about three hours; (3) frequently experienced pain, fatigue, or other symptoms that were severe enough to interfere with her attention and concentration; (4) needed to take unscheduled breaks of at least 30 minutes every one or two hours to rest or relieve pain; and (5) was likely to miss work more than three times a month as a result of her impairments or treatment for them.

In March 2013, Cross's primary care provider of nine years, Dr. Carl Ciak, wrote a letter, addressed "to whom it may concern," that notes her diagnosis of fibromyalgia and describes the treatment Cross had received for back and leg pain. He also offered the following opinion:

> Because of her ongoing symptoms she has been unable to work. Due to the pain she is not able to do any work that would require significant physical labor. In addition, she has difficulty in sitting or standing for any prolonged periods of time. Because this is a chronic condition I would anticipate that her symptoms will be ongoing and certainly exceed 12 months.

Tr. 546. In a letter dated May 16, 2013, addressed to Cross's counsel, Dr. Peter Noordsij, an orthopedist who had treated Cross for degenerative arthritis in her knees, opined that Cross

was not "capable of full time standing and/or competitive work."
Tr. 548.

In October 2013, Dr. Gorman wrote a letter, addressed "to
whom it may concern," that includes the following opinions on
her RFC:

> [T]hroughout the course of an eight hour work day, I
> believe that Ms. Cross would be limited to sitting
> less than one hour and standing/walking up to one hour
> total.  Further, she would be required to take
> unscheduled breaks to rest or relive pain every one to
> two hours for at least thirty minutes at a time before
> returning to work.
>
> Ms. Cross' experiences of pain, fatigue, and other
> symptoms are severe enough to frequently interfere
> with attention and concentration and that due to her
> severe medical conditions [she] would most likely be
> absent from work more than three times a month, on
> average.
>
> . . .  Ms. Cross' impairments are ongoing and expected
> to last at least an additional twelve months.

Tr. 921.

About a week after he wrote the letter quoted above, Dr.
Gorman completed a Fibromyalgia Impairment Questionnaire in
which he noted that he had most recently examined Cross in July
of 2013.  In the questionnaire, Dr. Gorman opined that Cross:
(1) could sit for one hour and stand/walk for up to an hour in
an eight-hour workday; (2) needed to get up and move around
every 30 to 60 minutes, and could sit down again in about 15

minutes; (3) could frequently lift and carry up to five pounds, but could never lift or carry any more than that; (4) would need to take unscheduled 15 minute breaks to rest every 60 minutes; and (5) would be absent from work more than three times a month due to her impairments or treatment for them.

After the Social Security Administration ("SSA") denied Cross's claim for DIB, she received a hearing before an ALJ.  At the hearing, the ALJ posed several hypothetical questions to a vocational expert ("VE"), including this one:

> Q.  And my second hypothetical is to assume that she can lift 10 pounds, stand or walk for two [hours] and should avoid all exposure to unprotected heights and never climb ladders, scaffoldings and ropes and the remaining postural [limitations] are at occasional.

Tr. 71.  The VE testified that a person with the RFC described by the ALJ could perform Cross's past relevant work as a customer-service representative.  The ALJ continued:

> Q.  . . .  My third hypothetical is to assume that she can occasionally lift up to 10 pounds, frequently [lift] up to five, she can sit for up to an hour and stand or walk for an hour, and she would need to be able to shift positions so that every hour she would need to get up and move around for about three hours. Let's see.  She has moderate limitation[s] with regard to fine manipulation, minimal [limitations] with regard to grasping, twisting and turning and no limitations with reaching.

Tr. 73-74.  The VE responded:

> A.  I would say that based on the hypothetical
> including the standing or walking for one hour,
> sitting for one hour and shifting at one hour
> intervals, moving about for three hours, would
> eliminate all jobs – previous relevant work and future
> jobs.

Id.  The ALJ's questioning of the VE continued:

> Q.  And if we . . . reduce the weight from 10 pounds
> to five pounds and we reduce the walking around period
> from three hours to 15 minutes every half hour to an
> hour would that change your opinion?
>
> A.  No, your honor.  That does not.  I believe that
> that is a less than sedentary work capacity.

Tr. 74-75.

> After the hearing, the ALJ issued a decision that includes

the following relevant findings of fact and conclusions of law:

> 5.  After careful consideration of the entire record,
> the undersigned finds that the claimant has the
> residual functional capacity to perform sedentary work
> as defined in 20 CFR 404.1567(a) except [that] she
> [can] lift 10 lbs., stand or walk for 2 hours in an 8-
> hour workday, and sit for 6 hours in an 8-hour
> workday.  . . .
>
> . . . .
>
> 6.  The claimant is capable of performing past
> relevant work as a customer service representative . .
> . .  This work does not require the performance of
> work-related activities precluded by the claimant's
> residual functional capacity (20 CFR 404.1565).

Tr. 37, 42.

## Discussion

A.   The Legal Framework

To be eligible for DIB, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  The only question in this case is whether Cross was under a disability from April 1, 2011 through March 25, 2014.

To decide whether a claimant is disabled for the purpose of determining eligibility for disability insurance benefits, an ALJ is required to employ a five-step process.  See 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920, which outlines the same five-step process as the one prescribed in 20 C.F.R. § 404.1520).

The claimant bears the burden of proving that she is disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  She must do so by a preponderance of the evidence.  See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) [claimant]'s subjective claims of pain and disability as supported by the testimony of the claimant or other witness; and (3) the [claimant]'s educational background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690 F.2d 5, 6 (1st Cir. 1982)).

B.   Cross's Claims

Cross claims that the ALJ erred by failing to properly weigh the opinions of Dr. Gorman and by failing to properly evaluate her credibility.  Cross's first claim is persuasive, and dispositive.

Under the regulations that govern the evaluation of claims for DIB, the opinions of acceptable medical sources who have treated a claimant are generally entitled to substantial weight.

Specifically, those regulations provide:

> Generally, we give more weight to opinions from [a
> claimant's] treating sources, since these sources are
> likely to be the medical professionals most able to
> provide a detailed, longitudinal picture of [a
> claimant's] medical impairment(s) and may bring a
> unique perspective to the medical evidence that cannot
> be obtained from the objective medical findings alone
> or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations.
> If we find that a treating source's opinion on the
> issue(s) of the nature and severity of [a claimant's]
> impairment(s) is well-supported by medically
> acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the other
> substantial evidence in [a claimant's] case record, we
> will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).  When an ALJ does not give

controlling weight to the opinion of a treating source, he must

determine how much weight to give it by applying the following

factors: (1) the length of the claimant's treatment relationship

and the frequency of examination; (2) the nature and the extent

of the treatment relationship; (3) the supportability of the

opinion; (4) the consistency of the opinion with the record as a

whole; (5) the specialization of the source who gave the

opinion; and (6) other factors.[3]  See 20 C.F.R. §§

---

[3] As examples of "other factors," the regulations identify:
(1) the source's understanding of the SSA's disability programs
and evidentiary requirements; and (2) "the extent to which [the]
acceptable medical source is familiar with the other information
in [a claimant's] case record."  20 C.F.R. § 404.1527(c)(6).

404.1527(c)(2)-(6).

In his decision, after giving little weight to the opinions
of Drs. Ciak and Noordsij, both of whom treated Cross, the ALJ
had this to say about Dr. Gorman's opinions:

> Although he too is a treating source of the claimant,
> and is a specialist in rheumatology, I gave little
> weight to the various opinions of John Gorman, M.D.
> Dr. Gorman's opinions were also so drastically
> divergent from the opinions of the non-examining State
> agency medical consultants, Drs. Fairley and Ramsey,
> who are experienced in evaluating disability claims,
> and have familiarity with the Social Security
> disability program rules and regulations, as to render
> them somewhat less reliable.  . . .
>
> I also gave little weight to Dr. Gorman's opinions
> because they are advocacy opinions, offered merely for
> the purpose of establishing disability, [and] because
> no similar work or activity restrictions are ascribed
> to the claimant in his treatment notes in relation to
> the claimant's care.  Further, I found Dr. Gorman's
> opinions to be inconsistent with the claimant's
> activities, including indications that she was going
> to the gym five days per week during the period she
> alleges she was disabled from performing gainful work,
> and indications by Dr. Gorman that the claimant was
> "[o]verall doing well."

Tr. 42 (citations to the record omitted).  While the ALJ's
decision speaks in general terms about Dr. Gorman's opinions,
the questioning of the VE at Cross's hearing establishes that
the relevant opinion from Dr. Gordon is that Cross could sit for
only about one hour in an eight-hour workday, a functional
limitation that is inconsistent with the ability to meet the

14

requirements of sedentary work.  See 20 C.F.R. § 404.1567(a).

The court begins with the ALJ's characterization of Dr. Gorman's opinions as "advocacy opinions."  To support that characterization, the Acting Commissioner relies upon Judge Laplante's order in Egan v. Astrue, which includes the following footnote:

> An ALJ may give less weight to an "advocacy opinion."
> See, e.g., Coggon [v. Barnhart], 354 F. Supp. 2d [40,]
> 53 [(D. Mass. 2005)].  In particular, where the record
> supports the inference that a medical opinion was
> "obtained specifically for the purpose of bolstering
> [a claimant's] case", an ALJ can properly give it less
> weight.  O'Dell [v. Astrue], 736 F. Supp. 2d [(378)],
> 387 [(D.N.H. 2010)]; cf. Evangelista [v. Sec'y of
> HHS], 826 F.2d [136,] 139 [(1st Cir. 1987)].  Dr.
> Estey's note began: "I am writing this letter at the
> request of Melissa Egan . . . in support of her
> receiving Social Security."  Admin. R. 552.  The ALJ
> was therefore entitled to afford Dr. Estey's opinion
> "minimal weight."  Id. at 13.

No. 11-cv-147-JL, 2012 WL 274483, at *5 n.16 (D.N.H. Jan. 31, 2012).

Here, Dr. Gorman's opinions are expressed in three separate documents: an Arthritis Impairment Questionnaire; a Fibromyalgia Impairment Questionnaire; and the October 2013 letter.  None of those three documents includes language like the statement in Egan that supported an inference of advocacy.  Moreover, the

facts of this case are different from the facts of Coggon,
O'Dell, and Evangelista.

Despite certain similarities between the circumstances of
this case and those in Coggon, there is one significant
difference.  In Coggon, an office notes authored by the treating
source includes a comment that "[u]nfortunately, her disability
[claim] was denied," 354 F. Supp. 2d at 46, which Judge Young
took to "indicate a potential bias and predisposition on [the
doctor's] part to advocate on [the claimant's] behalf," id. at
53.  There is no such evidence of bias or predisposition in Dr.
Gorman's treatment notes.

The opinion at issue in O'Dell was provided by a physician
who saw the claimant only once, twelve years after his insured
status had expired, and for the express purpose of rendering an
opinion for use in the disability determination process.  See
736 F. Supp. 2d at 386-87.  Under those circumstances, Judge
Barbadoro declined to disturb the Appeals Council's
determination that the opinion at issue merited diminished
weight:

> Opinions rendered by physicians retained by
> claimant's counsel ("advocacy opinions") may also be
> given less weight.  See Evangelista, 826 F.2d at 139;
> see also Coggon v. Barnhart, 354 F. Supp. 2d 40, 53
> (D. Mass. 2005) (holding that the ALJ reasonably gave

> less weight to an "advocacy" opinion because it
> indicated a "potential bias . . . to advocate on
> [claimant's] behalf").  In discussing the credibility
> of the medical opinion offered, the court in
> Evangelista noted that the inference was "inescapable"
> that the physician was retained by the claimant's
> counsel to evaluate his case.  Evangelista, 826 F.2d
> at 139.  Here, O'Dell was evaluated by Dr. Graf only
> at the express request of his attorney.  (Tr. at 8.)
> In this case, too, the inference is "inescapable" that
> his opinions were obtained specifically for the
> purpose of bolstering O'Dell's case, and the Appeals
> Council was correct to give them less weight.

O'Dell, 736 F. Supp. 2d at 387.

Unlike the physician in O'Dell, who did not treat the claimant and never even saw him until 12 years after his coverage for benefits had expired, and unlike the physician in Evangelista, who "first appeared on the scene . . . subsequent not only to the Secretary's final decision, but some nine months after suit had been instituted in the district court," 826 F.2d 139, Dr. Gorman began treating Cross approximately six months before she stopped working and approximately 18 months before she applied for DIB.  Thus, the inference is inescapable that Dr. Gorman was retained by Cross to treat her fibromyalgia, not by Cross's counsel to evaluate her case.  If, indeed, as Judge Barbadoro suggests, "advocacy opinions" are "[o]pinions rendered by physicians retained by claimant's counsel," O'Dell, 736 F.

17

Supp. 2d at 387, Dr. Gorman's opinions do not qualify as advocacy opinions in the first instance.

The ALJ's expansive view of "advocacy opinions" would seem to cover any opinion from a claimant's treating physician that is favorable to the claimant.  That is bad enough, but when coupled with the concept of deference to opinions from medical sources who understand the SSA's regulations, see 20 C.F.R. § 404.1527(c)(6), the ALJ's approach turns the SSA's guidance on evaluating medical opinions on its head.

Judge McCafferty has characterized the SSA's guidance this way:

> Under the applicable regulations, the Acting
> Commissioner, and by extension the ALJ, is directed
> generally to give the greatest weight to medical
> opinions from treating sources, less weight to
> opinions from sources who have only examined the
> claimant, and the least weight to [opinions from]
> medical source[s] who have neither treated nor
> examined the claimant.

Maynard v. Colvin, No. 14-cv-512-LM, 2015 WL 5838319, at *7 (Oct. 7, 2015) (citing 20 C.F.R. § 404.1527(c)).  In other words, there is a default bias in favor of opinions from treating sources.  But if favorable treating-source opinions are categorically identified as advocacy opinions that are entitled to less weight, and if the opinions of state agency consultants

18

who are familiar with SSA regulations are categorically afforded
greater weight, that comes close to establishing a default bias
in favor of the opinions of non-treating, non-examining state-
agency consultants, which is the exact opposite of what the
regulations envision.

There are additional problems with the ALJ's comparative
evaluation of the medical opinions in this case.  As noted
above, the ALJ favors the opinions of Drs. Fairley and Ramsey
over the opinions of Dr. Gorman because, in his view, Dr.
Gorman's opinions were "advocacy opinions."  But as between Dr.
Gorman on the one hand, and Drs. Fairley and Ramsey on the
other, it was Drs. Fairley and Ramsey, not Dr. Gorman, who were
"retained . . . to evaluate [Cross's] case."  Evangelista, 826
F.2d at 139.  Indeed, their only involvement with Cross was to
evaluate her medical records.  Dr. Gorman, by contrast, did not
begin giving opinions until after he had been treating Cross for
more than two years.  In addition, presumably in the context of
considering consistency with the record as a whole, see 20
C.F.R. § 404.1527(c), the ALJ noted that "Dr. Gorman's opinions
were . . . drastically divergent from the opinions of . . . Drs.
Fairley and Ramsey," Tr. 42, but he said nothing about the
strong convergence of Dr. Gorman's opinions with those of two

other treating sources, Drs. Ciak and Noordsij.  To properly assess consistency with the record as a whole, the ALJ should have acknowledged the consistency of Dr. Gorman's opinion with the opinions of the two other treating sources.

Having described the biggest problems with the manner in which the ALJ handled the medical opinions in this case, the court turns to several smaller issues that merit attention on remand.  First, the ALJ's decision says that while Dr. Gorman identified various limitations, "no similar work or activity restrictions are ascribed to the claimant in [Dr. Gorman's] treatment notes in relation to the claimant's care."  Tr. 42. Leaving aside the question of why any such limitations would be included in treatment notes in the first place, see Leckenby v. Astrue, 487 F.3d 626, 633 n.7 (8th Cir. 2007) (discounting the significance of a treating physician's failure to discuss, in treatment records, limitations on the ability of unemployed patient to perform work-related activities), the ALJ's statement ignores Dr. Gorman's March 22, 2012, treatment note, in which he indicated that Cross's fibromyalgia would likely worsen if she were to return to work.  See Tr. 333.

Second, while the ALJ makes much of the fact that Cross reported that she was going to the gym five days a week after

the alleged onset date of her disability, he simply notes that
fact without actually explaining the purported inconsistency
between Cross's going to the gym and Dr. Gorman's opinion that
she was incapable of meeting the sitting requirements of
sedentary work.  While it is for the ALJ to draw inferences from
the evidence, <u>see</u> <u>Irlanda Ortiz</u>, 955 F.2d at 769, the ALJ also
has an obligation to give good reasons . . . for the weight [he]
gives [a] treating source's opinion," 20 C.F.R. §
404.1527(c)(2).  That is where the ALJ's decision falls short.
The mere fact of going to the gym, even five days a week, when
reported without any consideration of what, exactly Cross was
doing at the gym, does not appear to be evidence a reasonable
mind might accept as adequate, <u>see</u> <u>Currier</u>, 612 F.2d at 597, to
support a finding that Cross had the RFC to meet the sitting
requirements of sedentary work.

In sum, the ALJ has failed to give to give good reasons for
giving greater weight to the opinions of Drs. Fairley and Ramsey
than he gave to the opinions of Dr. Gorman.  That warrants a
remand.

## **Conclusion**

For the reasons given, the Acting Commissioner's motion for

an order affirming her decision (doc. no. 12) should be denied, and Cross's motion to reverse that decision (doc. no. 9) should granted to the extent that the case is remanded to the Acting Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).

Any objection to this Report and Recommendation must be filed within 14 days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file an objection within the specified time waives the right to appeal the district court's order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011); Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by objections to magistrate judge's report are subject to review by district court; issues not preserved by such objection are precluded on appeal).

_____
Andrea K. Johnstone
United States Magistrate Judge


April 4, 2016

cc:  Daniel S. Jones, Esq.
     Brenda M. Golden Hallisey, Esq.
     Terry L. Ollila, Esq.